FILED
02/06/2024
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 24, 2023 Session[1]

## STATE OF TENNESSEE v. DAVID WAYNE EADY

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2018-B-952     Cheryl A. Blackburn, Judge**

———————————————————

### No. M2021-00388-SC-R11-CD

———————————————————

This appeal presents two issues. First, we consider whether the District Attorney General's Office should have been disqualified from prosecuting this case because the District Attorney General previously served as counsel for the accused in a separate case. Second, we consider the propriety of conducting a single trial for multiple offenses under the theory that the separate crimes were all parts of a larger, continuing plan. David Wayne Eady was charged in one indictment with committing multiple robberies in Nashville over the course of a month. Mr. Eady moved to disqualify the District Attorney General's Office, primarily because the District Attorney General had represented him in a criminal matter approximately thirty years earlier. The prior matter resulted in a conviction that the State sought to use in this case to qualify Mr. Eady as a repeat violent offender for sentencing purposes. The trial court denied the motion to disqualify, noting the limited nature of the District Attorney General's involvement in this case and the "mandatory nature of the repeat violent offender statute." See Tenn. Code Ann. § 40-35-120(g) (2019). Mr. Eady also moved to sever the offenses, which the trial court denied upon finding that the crimes were parts of a common scheme or plan and that the evidence of one offense would be admissible in the trial of the others. See Tenn. R. Crim. P. 14(b)(1). Mr. Eady ultimately was convicted as charged of eleven counts of aggravated robbery, two of which later were merged, and one count of attempted aggravated robbery. Upon Mr. Eady's appeal as of right, a divided panel of the Court of Criminal Appeals affirmed. State v. Eady, No. M2021-00388-CCA-R3-CD, 2022 WL 7835823, at *1 (Tenn. Crim. App. Oct. 14, 2022), perm. app. granted, (Tenn. Jan. 31, 2023). The intermediate appellate court was unanimous in rejecting the challenge to prosecution of the case by the District Attorney General's Office. Id. at *34–35. After noting that there was "no real dispute between the parties that [the District Attorney General] had an actual conflict of interest disqualifying him from participating in [Mr. Eady's] prosecution," the court seemed to proceed on the assumption

———

[1] We heard oral argument in this case at Tennessee Technological University in Cookeville, Tennessee, as part of the Tennessee American Legion Boys State S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

that an actual conflict of interest existed but nevertheless held that this conflict did not require disqualification of the entire office. Id. at \*34. In addition, a majority of the court upheld the denial of a severance. Id. at \*28–30. One judge dissented, however, concluding that the offenses should have been severed because the evidence did not reflect that the offenses were parts of a larger, continuing plan. Id. at \*38–42 (McMullen, J., dissenting in part). We granted Mr. Eady's appeal to address both issues. As for the motion to disqualify, we agree with the State's argument before this Court that the circumstances do not establish an actual conflict of interest for the District Attorney General, and we conclude that the trial court correctly denied the motion to disqualify the District Attorney General's Office. As for the motion to sever, we have determined that the record does not establish that the offenses were parts of a larger, continuing plan. Thus, we conclude that the trial court erred in denying a severance. However, we find the error harmless as to all convictions except the one in count eight. Accordingly, we affirm the judgment of the Court of Criminal Appeals in part, reverse it in part, and remand to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Affirmed in Part, Reversed in Part;**
**Case Remanded to the Criminal Court**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., and SHARON G. LEE, ROGER A. PAGE, and SARAH K. CAMPBELL, JJ., joined.

Martesha Johnson Moore, District Public Defender; Will Allensworth and Jeffrey A. DeVasher (on appeal), Jared Mollenkof and Julie Bigsby (at trial), Assistant District Public Defenders, for the appellant, David Wayne Eady.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Blumstein, Solicitor General; Richard D. Douglas, Senior Assistant Attorney General; Glenn Funk, District Attorney General; Megan King and Joey Clifton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose from eleven incidents that occurred in various retail businesses in Nashville over the course of November 2017. During each incident, a seemingly armed white man whose features were concealed for the most part—alleged to be David Wayne Eady ("the Defendant")—entered a business and demanded money or retail items from an employee. The time of day of the incidents varied from mid-afternoon to shortly after midnight. The perpetrator appeared to hold the gun mostly in his left hand. The perpetrator was successful in ten of the incidents, but the proof did not show that he obtained anything

in the eleventh. Video surveillance captured the incidents and was played for the jury at trial. To aid our resolution of the severance issue, we will summarize the incidents chronologically.

Count Twelve: On November 2, 2017, Brenda Wilson was working at a Dollar General located at 1201 Eighth Avenue South. At approximately 5:45 p.m., a white man entered the store holding what appeared to be a gun. The man wore a black mask of some sort and was taller than 5'6" or 5'7", which was Ms. Wilson's height. When the man approached Ms. Wilson at the cash register, she fled. Thus, Ms. Wilson was unable to say if the man took anything from the store,[2] nor was she able to identify him. The man was not wearing gloves, and latent fingerprints were lifted at the store. Due to the poor quality of the fingerprints, however, they could not be compared to the Defendant's fingerprints. Police investigation revealed that the Defendant's cell phone communicated with a cell tower in the general area of the store at 6:26 p.m.[3] The Defendant admitted to police that he was responsible for this attempted robbery.

Count Ten: Three days later, on November 5, 2017, Jonathan Latham was working at a Walgreens located at 2819 Nolensville Pike. At approximately 3:30 p.m., a white man entered the store holding what appeared to be a gun in his left hand. The man wore sunglasses and a dark, "rodeo-pattern-type" bandana over his face, such that Mr. Latham was unable to identify him. He also wore a "darkish hoody" with the hood pulled up and gloves. The man demanded money from the register, and Mr. Latham complied. The Defendant admitted to police that he was responsible for this robbery.

Count Eleven: Four days later, on November 9, 2017, Shino Hussain was working at a CVS located at 4709 Nolensville Pike. At approximately 3:20 p.m., a man, possibly white, entered the store holding what appeared to be a gun. He was approximately six feet tall. The man's face was covered, and he was wearing a "hooded shirt." As such, Ms. Hussain was unable to identify the man. The man handled the gun with both hands. He demanded money, which Ms. Hussain gave him from the register. The man was not wearing gloves, and latent fingerprints were lifted at the scene. Due to the poor quality of the fingerprints, however, they could not be compared to the Defendant's fingerprints. Police investigation revealed that the Defendant's cell phone communicated with cell

---

[2] In December 2017, during the investigation of the offenses, the Defendant gave a statement to police in which he admitted responsibility for all but one of the incidents. In his statement, the Defendant indicated that the cash register would not open on this occasion, so he took no money.

[3] The Defendant hotly contested this evidence, offering his own expert testimony to attack the State's expert testimony with regard to what could be gleaned from the cell phone data in question. Ultimately, however, there was little dispute as to the fact of communication with the specified towers at the specified times. In addition to his expert testimony, the Defendant also suggested that because he lived in the general area of some of the locations, it would be expected for his cell phone to communicate with some of the towers.

towers in the general area of the store multiple times from 3:04 p.m. to 3:58 p.m. The Defendant admitted to police that he was responsible for this robbery.

Counts One and Two: Two days later, on November 11, 2017, Jazlyn Oropeza, Josianne Hunter, and Beverly Adcock were working at a Walgreens located at 518 Donelson Pike. At approximately 7:00 p.m., a white man entered the store holding what appeared to be a gun in his left hand. Because the man wore a hoody, sunglasses, and some type of black face mask, the employees were unable to identify him. Ms. Oropeza estimated the man to be 5'9" tall and 150 pounds, while Ms. Hunter estimated him to be just shorter than her 5'11" height. The man demanded and received money from two cash registers, one manned by Ms. Oropeza[4] and the other manned by Ms. Adcock.[5] The Defendant admitted to police that he was responsible for this robbery.

Count Three: Four days later, on November 15, 2017, Timothy Bushong was working at a Delta Express/Mapco located at 15131 Old Hickory Boulevard. At approximately 9:45 p.m., a white man entered the store holding what appeared to be a gun. The man was wearing a hoody, sunglasses, gloves, and a handkerchief or bandana over his face. Thus, Mr. Bushong could not identify the man. Mr. Bushong estimated the man to be 5'6" or 5'7" tall. The man demanded cash from the register and ordered Mr. Bushong to produce additional money by "dropping a tube" from a safe. Mr. Bushong complied. Police investigation revealed that the Defendant's cell phone communicated with cell towers in the general area of the store multiple times between 9:49 p.m. and 9:58 p.m. The Defendant admitted to police that he was responsible for this robbery.

Count Four: Three days later, on November 18, 2017, Ralph Calhoun was working at a Delta gas station located at 2601 Murfreesboro Pike. At approximately 5:30 p.m., a white man entered the store holding what appeared to be a gun in his left hand. The man was wearing a jacket and a mask. When speaking to police after the incident, Mr. Calhoun described the man as 5'11" tall and weighing 150 to 200 pounds, but during his trial testimony he stated the man was 6'2" tall. Mr. Calhoun was unable to identify the man.[6] The man demanded money from the cash register and cartons of cigarettes. Mr. Calhoun complied, after which the perpetrator ordered Mr. Calhoun to lie on the floor and count to fifty. Police investigation revealed that the Defendant's cell phone communicated with cell towers in the general area of the store multiple times between 5:47 p.m. and 5:59 p.m.

---

[4] Ms. Hunter assisted Ms. Oropeza in producing money from the cash register.

[5] This incident made up counts one and two of the indictment, the offenses that later were merged into a single conviction by the Court of Criminal Appeals. See Eady, 2022 WL 7835823, at *36–37.

[6] Mr. Calhoun admitted at trial that he identified a customer who came into the store the following day as potentially being the perpetrator. Mr. Calhoun explained that he was still under stress from the incident, and the customer was of the same general build as the perpetrator. Mr. Calhoun clarified at trial that he no longer believed the customer was the perpetrator.

Police investigation also revealed text messages sent from the Defendant's cell phone offering to sell cartons of cigarettes on November 19 and 20. The Defendant admitted to police that he was responsible for this robbery and that he later sold some of the cigarettes in various bars.

Count Nine: Two days later, on November 20, 2017, Jason Hamilton was working in a Twice Daily located at 1330 Vultee Boulevard. At approximately 11:45 p.m., a white man entered the store and asked for a pack of cigarettes. When Mr. Hamilton turned around after getting the cigarettes, the man was holding what appeared to be a gun in his left hand. Because the man was wearing "heavy" winter clothing and a mask over his face, Mr. Hamilton was unable to identify him. The man demanded money from the register and from a "tube" from the safe. Mr. Hamilton complied, after which the perpetrator ordered Mr. Hamilton to lie on the floor. Police investigation revealed that the Defendant's cell phone communicated with a cell tower in the general area of the store at 12:01 a.m. on November 21, 2017. The Defendant admitted to police that he was responsible for this robbery.

Count Five: Four days later, on November 24, 2017, Raouf Essa was working in a Delta Express/Mapco located at 440 Harding Place. At approximately 3:20 p.m., a white man entered the store and demanded money. He was holding what appeared to be a gun in his left hand. The man stood approximately 5'9" tall and was wearing gloves and a jacket with his head and face covered. The perpetrator demanded money, and Mr. Essa produced cash from the register. Mr. Essa identified the Defendant as the perpetrator, both before trial and at trial.[7] Video surveillance footage showed a gold Toyota Camry at the scene. Police investigation revealed that the Defendant's cell phone communicated with cell towers in the general area of the store multiple times between 3:37 p.m. and 4:01 p.m. The Defendant admitted to police that he was responsible for this robbery. The Defendant also admitted that the gold Toyota Camry from the surveillance video was his and that another individual drove him away from the scene after the robbery.

Count Six: The very next day, on November 25, 2017, Tamar Ishak was working in a Mapco Express located at 3043 Nolensville Pike. Shortly after midnight, a white man entered the store, selected a bottle of water, and brought it to the counter. At that point, the man displayed what appeared to be a gun in his left hand and demanded money, which Mr. Ishak produced from the register. The man was forty to forty-five years old, of medium height, and wore gloves, a jacket with the hood up, sunglasses, and a mask over his face. As such, Mr. Ishak was not able to identify the man. Police investigation revealed that the Defendant's cell phone communicated with cell towers in the general area of the store multiple times between 12:31 a.m. and 12:53 a.m. The Defendant admitted to police that he was responsible for this robbery.

---

[7] Mr. Essa was the only victim who identified the Defendant as the perpetrator.

Count Eight: One day later, on November 26, 2017, Stella Rice was working in a Delta Express located at 18 Thompson Lane. At approximately 5:00 p.m., a white man entered the store, pointed what appeared to be a gun at her, and demanded money. She initially described the man to police as thirty-five to forty years old, 5'7" tall and 180 pounds. However, she testified at trial that she was 5'7" tall, and he was taller, probably 5'8" tall. The man was wearing a gray hoody, blue jeans, gloves, sunglasses, and a black mask over his face. Thus, Ms. Rice was unable to identify him. Ms. Rice opened the register and stepped back, at which point the perpetrator reached into the register and removed cash. Ms. Rice believed that video surveillance footage depicted the perpetrator holding the gun in his left hand, but she stated "[i]t was confusing." Police investigation revealed that the Defendant's cell phone communicated with a cell tower in the general area of the store multiple times between 5:28 p.m. and 5:30 p.m. The Defendant did not admit responsibility for this robbery, telling police, "I don't remember doing one on Thompson Lane."

Count Seven: Four days later, on November 30, 2017, Nathan Allen was working in a Mapco located at 5040 Nolensville Pike. At approximately 9:00 p.m., a white man entered the store and displayed what appeared to be a gun in his left hand. The man was wearing a jacket with the hood up, sunglasses, and a "colorful" mask or scarf over his face. The man was approximately 5'9" tall and of about average build. Police investigation revealed that the Defendant's cell phone communicated with cell towers in the general area of the store multiple times between 8:30 p.m. and 9:16 p.m. The Defendant admitted to police that he was responsible for this robbery.

Police investigating the incidents received a break when video surveillance footage of the November 24 robbery revealed a gold Toyota Camry at the scene. The footage showed the driver of the vehicle get out and approach the Delta Express/Mapco store, while the passenger got out and moved to the driver's position. The driver soon returned at a quicker pace and got into the passenger seat, at which point the vehicle pulled away. Two days later, on November 26, police encountered a gold Toyota Camry and two men, one of whom was the Defendant. Police approached, and during the course of a conversation between police and the Defendant, he revealed that he was left-handed and gave police his cell phone number. Several days later, police generated a report indicating that the Defendant's cell phone had communicated with a cell tower in the general area of the Delta Express/Mapco near the time of the November 24 robbery. As a result, police obtained a warrant to place a tracker on the Defendant's car. During the tracking time period—December 5 to 11—the car was not linked to any robberies.[8]

Nevertheless, police arrested the Defendant on December 11 for a traffic offense and brought him in for questioning. As summarized above, the Defendant admitted responsibility for all but one offense. He indicated that he discarded clothing that he wore

---

[8] Unbeknownst to police, the Defendant was in a detox center from December 6 to December 10.

during various robberies and that he did not use a real gun. However, forensic examination of the Defendant's cell phone revealed an internet search for "gun shops in Nashville" in October 2017. Additionally, the Defendant's cell phone contained a text message from December 1, 2017, the day after the final (November 30) incident, stating "I did another one last night but only got $55." At the time of his arrest in December 2017, the Defendant was a fifty-four-year-old white man standing 5'11" tall and weighing 200 pounds.

During his statement to police, the Defendant revealed the motivation behind his series of crimes. The Defendant explained that he was released from prison—having served time for prior robberies—in September 2015. He managed to secure employment and "was doing good" for about a year and a half. However, two or three months before his arrest, he met a couple of individuals who were using heroin. The Defendant stated, "I was [on the right track], and then I got on the [h]eroin." The Defendant apparently lost his job, and he needed money to purchase heroin. As a result, he went "back to what [he] knew"—robbery—to supply the money for his heroin usage.[9] The Defendant explained, "This didn't start happening [until] I got on the heroin. And the only reason I did it was to, I couldn't find a job. If I could find a job, I'd have worked to pay for my heroin." The Defendant further explained that he "didn't do it to get rich. . . . [It's] just my drug addiction."

The Defendant was charged in a single indictment with twelve counts of aggravated robbery for the eleven incidents.[10] A jury convicted him of eleven counts of aggravated robbery and one count of attempted aggravated robbery.[11] For the aggravated robbery convictions, the trial court sentenced the Defendant as a repeat violent offender to eleven concurrent terms of life imprisonment without the possibility of parole. For the attempted aggravated robbery conviction, the trial court sentenced the Defendant to a concurrent term of fifteen years of imprisonment. On direct appeal, the Court of Criminal Appeals merged the two counts associated with the November 11 incident (counts one and two) into a single conviction. State v. Eady, No. M2021-00388-CCA-R3-CD, 2022 WL 7835823, at *37–38 (Tenn. Crim. App. Oct. 14, 2022), perm. app. granted, (Tenn. Jan. 31, 2023). Aside from merging counts one and two into a single conviction, the Court of Criminal Appeals affirmed the Defendant's convictions and sentences. Id. at *1, 38.

---

[9] The Defendant spoke with police about his criminal history, including prior robbery convictions. At one point, the Defendant stated that he and his brother "both have always been robbers. That's what we've always done. Used to be motels back in the day. Back in the 80's, you know what I mean. In the early 90's. The motels were the easiest things to rob you know."

[10] As previously described, during the November 11 incident, the perpetrator accosted multiple employees and obtained cash from two registers. The indictment contained two separate counts (counts one and two) associated with this incident.

[11] The Defendant originally was indicted on aggravated robbery for all counts. Because the proof did not show that he obtained anything during the November 2 incident (count twelve), the charge ultimately submitted to the jury with respect to that count was attempted aggravated robbery.

*A. The Motion to Disqualify the District Attorney General's Office*

Before trial, the Defendant filed a motion to disqualify the District Attorney General's Office from prosecuting the case. The gravamen of the motion was that the District Attorney General ("General Funk") represented the Defendant in 1989 in a criminal case in neighboring Cheatham County.[12] In that case, the Defendant pleaded guilty to aggravated robbery and received a ten-year sentence. He served time in prison and ultimately was released in 1992. In June 2018, after the Defendant's indictment in the present case, the State filed a notice that the Defendant qualified as a "repeat violent offender" for sentencing purposes based on his prior aggravated robbery convictions, one of which was the 1989 conviction. See Tenn. Code Ann. § 40-35-120(a)(2) (2019). Tennessee law mandates a sentence of life imprisonment without the possibility of parole ("LWOP") for a defendant who is convicted of certain offenses, including aggravated robbery, if that defendant qualifies as a repeat violent offender. See Tenn. Code Ann. § 40-35-120(g) (2019). Thus, in this case, when the Defendant was convicted of aggravated robbery, the trial court sentenced him to LWOP for each such conviction.

The Defendant also noted that General Funk represented his brother in the mid-1990s on a host of charges in Nashville and surrounding counties. The Defendant's brother ultimately pleaded guilty to multiple charges and received a total sentence of seventy-four years in prison. The Defendant's brother pursued an ineffective assistance of counsel claim in 2006, which was denied.

The trial court conducted a hearing on the motion. At the hearing, General Funk testified that when he was elected to office, he contacted the Board of Professional Responsibility concerning the prosecution of former clients.

> They advised that it was not going to be a problem for our office to prosecute folks who were former clients. That if . . . or when there were cases where they were prosecuting former clients, that I could not divulge any of the information about that case or anything, any information that I had gotten about those earlier cases from my clients. But that as long as no confidences were betrayed, that there is no ethical issue with the district attorney's office . . . prosecuting cases against clients that I had represented in my private practice.

General Funk also testified about the office procedure related to decisions to seek a sentence of LWOP. For a murder case in which the State sought the death penalty or LWOP, the decision was made in consultation with the District Attorney General and

---

[12] General Funk was in private practice, including criminal defense work, for many years before being elected to office in 2014.

- 8 -

others. In contrast, when the sentence would result from a defendant's qualifying as a repeat violent offender and being convicted of an eligible offense, the decision[13] was made at "the team leader level," not involving the District Attorney General.

Nevertheless, the assistant district attorney ("the ADA") handling this case requested a meeting with General Funk during which she expressed an intent to pursue the LWOP sentence.[14] However, it was not uncommon for this ADA to meet with General Funk "just to run things by [him]." On this occasion, the ADA provided a two-to-three-minute synopsis of the case. At that time, General Funk was unaware that the case involved a former client. General Funk told the ADA that filing the notice of the Defendant's status as a repeat violent offender was appropriate and the ADA was "making the right decision on behalf of the office." In his testimony, General Funk maintained that "the decision was actually made by [the ADA] as the team leader."

In February 2019, approximately eight months after the State first filed notice designating the Defendant as a repeat violent offender, the Defendant filed his motion to disqualify. As a result, it became apparent that General Funk had represented the Defendant on the 1989 Cheatham County case. Thereafter, General Funk had another conversation with the ADA in advance of the hearing on the motion to disqualify. During that conversation, General Funk confirmed that the ADA had not identified the Defendant as a former client during the prior conversation. General Funk also explained:

There may have been just remind me again why we were seeking life without parole, and [the ADA] would have gone through what his record was and what these events that [led] to the indictment were. But it would've been less than a minute on that topic. It was a courtesy review of what [the Defendant's] claims were and what the case was about.

General Funk re-articulated to the ADA his position that it was appropriate for the office to seek a sentence of LWOP.

At the hearing, General Funk identified various documents—motions, discovery requests, plea agreements, judgments, and the like—associated with his representation of the Defendant and his brother. However, General Funk made clear that he did not recall

---

[13] The "decision" General Funk referred to was to file a requisite pretrial notice designating a defendant as a repeat violent offender, after which the trial court must determine whether the defendant qualifies under the statute. See Tenn. Code Ann. § 40-35-120(i)(2) (2019). Tennessee law mandates a sentence of LWOP for a repeat violent offender, but only upon conviction of certain offenses, including aggravated robbery. See Tenn. Code Ann. § 40-35-120(g) (2019).

[14] Although a District Attorney General generally retains discretion to amend a charged offense to one that would not trigger the mandatory sentence of LWOP, no such action occurred in this case. See Tenn. Code Ann. § 40-35-120(f) (2019); Tenn. R. Crim. P. 7(b).

anything about his representation of the Defendant in 1989 or the Defendant's brother in the mid-1990s.

The trial court denied the motion to disqualify. In so doing, the trial court accredited the State's testimony indicating the limited nature of the interaction between General Funk and the ADA. More significant for the trial court, however, was the mandatory nature of the LWOP sentence. The public fact of the Defendant's qualifying prior convictions, including the 1989 aggravated robbery conviction, was not in dispute. Thus, the trial court noted that should the Defendant be convicted of any of the aggravated robberies with which he was charged, he unequivocally would receive a sentence of LWOP because he would qualify as a repeat violent offender. See Tenn. Code Ann. § 40-35-120(g) (2019). The trial court also pointed out that Tennessee law even precluded it from accepting a plea agreement "that fails to recommend that a defendant with a sufficient number of designated prior convictions be sentenced as a repeat violent offender." Tenn. Code Ann. § 40-35-120(f) (2019).

On direct appeal, the Court of Criminal Appeals found no error in the trial court's decision. Eady, 2022 WL 7835823, at *35. In its treatment of the issue, the intermediate appellate court noted, "There is no real dispute between the parties that General Funk had an actual conflict of interest disqualifying him from participating in Defendant's prosecution." Id. at *34 (citing Tenn. Sup. Ct. R. 8, RPC 1.9(a), 1.11(d)(2)(i)). The court was not persuaded by the Defendant's argument that General Funk "engaged in this case in a meaningful manner when he reiterated his opinion to [the ADA] that it was appropriate for the Office to seek the repeat violent offender designation . . . after he learned that he had previously represented Defendant." Id. at *12 (internal quotation marks omitted). The court stated:

> While we are likewise concerned that General Funk spoke with ADA King about the case after the motion to disqualify had been filed, there is nothing in the record to show that a confidence was divulged relevant to the current prosecution and materially adverse to Defendant. There is no proof that General Funk revealed any confidences gained from his former representation relevant to the prosecution of the case. Defendant's 1989 Cheatham County conviction was a matter of public record.

Id. at *34. The court also observed that "the status of repeat violent offender did not hinge on General Funk's approval of the request [to file a notice designating the Defendant as a repeat violent offender]." Id. In this vein, the court recognized that because "the State's evidence of Defendant's repeat violent offender status was uncontroverted[,] . . . the trial court was required to impose a sentence of life imprisonment without the possibility of parole as to Defendant's aggravated robbery convictions." Id. at *35.

*B. The Motion to Sever Offenses*

Before trial, the Defendant also filed a motion to sever all counts except the two stemming from the single incident that occurred on November 11 (counts one and two).[15] As we will discuss in more detail below, resolution of the motion required an inquiry into whether: (1) the charged offenses were parts of a common scheme or plan; (2) the evidence of each offense was relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of other offenses was outweighed by any unfair prejudicial effect that admitting the evidence would have. See Tenn. R. Crim. P. 14(b)(1); State v. Denton, 149 S.W.3d 1, 13 (Tenn. 2004) (citing Tenn. R. Evid. 404(b)(2), 404(b)(3)).[16] As for the first part of the inquiry, Tennessee courts recognize three categories of "common scheme or plan" evidence: (1) offenses that exhibit a distinctive design or are so similar as to constitute signature crimes; (2) offenses that are parts of a larger, continuing plan or conspiracy; or (3) offenses that are all part of the same criminal transaction. See, e.g., Denton, 149 S.W.3d at 13; see generally Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[12][a], at 4-115 (6th ed. 2011). In this case, the State contended that the individual robberies were parts of a larger, continuing plan.

The trial court conducted a hearing on the motion to sever.[17] The State introduced a chart summarizing the evidence associated with each incident, a map identifying the location of the incidents, and still images from video surveillance footage of the incidents. Before the trial court, the State argued that the larger, continuing plan was evidenced by a "common goal or purpose" of the offenses, namely "to fuel [the Defendant's] addiction to buy heroin." As for evidentiary relevance, the State argued that evidence of the larger, continuing plan reflected in the various offenses was relevant to the material issue of identity of the perpetrator. Finally, with respect to the balance of probative value versus unfair prejudice, the State contended that the probative value of the offenses was "particularly significant" because "the robberies [were] done in generally the same manner, . . . similar businesses in roughly the same location."

For his part, the Defendant argued that the State was confusing the distinctive design or signature crime category with the larger, continuing plan category. The Defendant argued that a larger, continuing plan "requires proof of a working plan, operating towards

---

[15] In this opinion, although we will refer generally to severance of the offenses, our treatment of the issue does not apply to severing counts one and two from each other.

[16] As our citations to Tennessee Rule of Evidence 404(b) in Denton make clear, trying multiple offenses together raises concerns much like when admitting evidence of other crimes in the trial of a single offense. Thus, there is an obvious overlap with principles surrounding Rule 404(b)'s general prohibition of character/propensity evidence.

[17] The hearing also addressed the Defendant's motion to suppress his statement to police. Thus, the trial court had before it not only the evidence pertaining to the offenses, but also the Defendant's statement to police.

the future with such force as to make probable the crime for which the defendant is on trial." According to the Defendant, "[a] working plan occurs when subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses." The Defendant contended that the various offenses he was charged with committing did not "build off one another in any sort of way." Furthermore, the Defendant argued that simply having a common goal of stealing money to purchase drugs did not support trying separate offenses together under the theory of a larger, continuing plan. As for the balance of probative value versus unfair prejudice, the Defendant argued that the similarity of the offenses was quite general in nature, and, thus, the probative value of the offenses as to the issue of identity was low in comparison to what the Defendant characterized as "extremely prejudicial propensity evidence here."

The trial court denied the motion to sever.[18] The trial court found that identity was a material issue and that the probative value of the evidence of other offenses was "particularly significant and outweigh[ed] potential prejudice." As for the common scheme or plan part of the analysis, the trial court noted the State's argument that the Defendant committed the offenses "with the common goal, or purpose, to fuel his drug addiction and purchase heroin." Ultimately, the trial court found that the offenses were parts of a larger, continuing plan because the proof showed a "working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." See Cohen, supra, § 4.04[12][c], at 4-120.

On direct appeal, a majority of the Court of Criminal Appeals agreed with the trial court. The majority acknowledged that a "shared motivation for two otherwise unrelated crimes is not sufficient to establish a 'common scheme or plan.'" Eady, 2022 WL 7835823, at *26 (quoting State v. Prentice, 113 S.W.3d 326, 332 (Tenn. Crim. App. 2001)). However, the majority did note that the Defendant admitted to police that "the robberies were the product of a continuing motive – to obtain money for heroin." Id. at *28. The majority found proof of a larger, continuing plan based on its conclusion that "[i]n this instance, Defendant's mission was not to get rich, but to steal enough money to buy heroin to hold him over for a few days. When the heroin ran out, he would rob another store." Id. The majority also placed significance on the similarity of the offenses: "Altogether, Defendant robbed eleven convenience stores, located in a confined geographic area, over a short period of time, and robbed them in the same manner, dressed in similar type clothing, and armed with the same type of weapon." Id. at *29. Ultimately, the majority concluded that the evidence showed that the "Defendant expressed a goal and motivation for his crimes and developed a working plan toward accomplishing that goal." Id. at *28.

Judge Camille R. McMullen disagreed with the majority that there was proof that the offenses were parts of a larger, continuing plan. Id. at *38 (McMullen, J., dissenting in part). Judge McMullen noted that a "larger, continuing plan or conspiracy 'involves not

---

[18] The Defendant later filed a motion to reconsider this ruling, which the trial court also denied.

- 12 -

the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" Id. (McMullen, J., dissenting in part) (quoting Denton, 149 S.W.3d at 15). In addition, Judge McMullen also noted that a "shared motivation" for otherwise separate crimes is insufficient to establish a larger, continuing plan. Id. (McMullen, J., dissenting in part) (quoting State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In Judge McMullen's view, the Defendant's confession "provided his reason or motivation to commit the robberies—to support his drug addiction—and nothing more." Id. at *40 (McMullen, J., dissenting in part). Furthermore, Judge McMullen concluded that the record showed that the Defendant's "behavior amounts to random, opportunistic criminal acts and not the product of any preconceived plan." Id. (McMullen, J., dissenting in part).

## II. ANALYSIS

We granted the Defendant's request for permission to appeal to consider the disqualification issue and the severance issue. Based on our review of the record, we have determined that the trial court did not err in denying the Defendant's motion to disqualify the District Attorney General's Office from prosecuting this case. We also have determined that the trial court did err in denying the motion to sever, but the error was harmless with respect to all convictions except the one tied to count eight (the November 26 incident). Accordingly, we affirm the judgment of the Court of Criminal Appeals in part, reverse it in part, and remand this case to the trial court for further proceedings consistent with this opinion.

### A. The Disqualification Issue

Tennessee law recognizes that loyalty is an "essential element[] in the lawyer's relationship to a client." Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 1 (2019). In recognition of the importance of this principle, Tennessee law specifically identifies rules addressing a lawyer's duties to former clients. See Tenn. Sup. Ct. R. 8, RPC 1.9 (2019). A lawyer serving as a public officer or employee generally is subject to those rules. Tenn. Sup. Ct. R. 8, RPC 1.11(d)(1) (2019). However, Tennessee law also recognizes that the rules governing lawyers employed by a government agency "should not be so restrictive as to inhibit transfer of employment to . . . the government." Tenn. Sup. Ct. R. 8, RPC 1.11 cmt. 4. We are called upon here to examine these rules in the context of a criminal case prosecuted by a District Attorney General's Office whose District Attorney General previously represented the Defendant.

In this case, the record demonstrates that General Funk, while in private practice, represented the Defendant in a criminal case in Cheatham County in 1989. In the course of that representation, the Defendant pleaded guilty to aggravated robbery. The Defendant served his sentence. Years later, in 2014, the Defendant's former counsel was elected District Attorney General for Davidson County. In 2018, the Defendant was indicted for the robbery offenses at issue in this case. The State filed a notice designating the Defendant

- 13 -

as a repeat violent offender for sentencing purposes, listing as one of the necessary qualifying offenses the Cheatham County aggravated robbery conviction from 1989. See Tenn. Code Ann. § 40-35-120(a)(2) (2019).

Based on General Funk's prior representation on the 1989 case, the Defendant filed a motion to disqualify the District Attorney General's Office from prosecuting the case. The Defendant elicited proof that the ADA handling the case had a conversation with General Funk—characterized as a two-to-three-minute synopsis of the case—before deciding to file the notice designating the Defendant as a repeat violent offender. Although office policy dictated that the decision was one made at "the team leader level" rather than in consultation with the District Attorney General, General Funk told the ADA that she was "making the right decision on behalf of the office." At the time, General Funk was unaware that the case involved a former client. However, after that fact became apparent, General Funk had another conversation with the ADA—this time in advance of the hearing on the motion to disqualify—that was characterized as "a courtesy review of what [the Defendant's] claims were and what the case was about." General Funk reiterated to the ADA that it was appropriate for the office to have filed the notice designating the Defendant as a repeat violent offender. The proof is uncontroverted that at no time did General Funk recall anything about his representation of the Defendant in 1989.

The trial court denied the motion to disqualify. Although the trial court acknowledged the limited nature of the interaction between General Funk and the ADA, the trial court's focus was on the mandatory nature of the Defendant's repeat violent offender status and resulting sentence of LWOP upon conviction for aggravated robbery. The Court of Criminal Appeals affirmed, noting in its treatment of the issue, "There is no real dispute between the parties that General Funk had an actual conflict of interest." Eady, 2022 WL 7835823, at *34. The Defendant now seeks relief in this Court, arguing that the trial court erred in denying the motion to disqualify.

*1. Standard of Review*

We review a trial court's decision to disqualify a lawyer for a conflict of interest, and to vicariously disqualify the lawyer's office, under an abuse of discretion standard. State v. Davis, 141 S.W.3d 600, 613 (Tenn. 2004); Clinard v. Blackwood, 46 S.W.3d 177, 182 (Tenn. 2001) (citing State v. Culbreath, 30 S.W.3d 309, 312–13 (Tenn. 2000)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." Harmon v. Hickman Cmty. Healthcare Servs., Inc., 594 S.W.3d 297, 305 (Tenn. 2020) (quoting Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)). The interpretation of the Rules of Professional Conduct, however, is a question of law that we review de novo. Lockett v. Bd. of Pro. Resp., 380 S.W.3d 19, 25 (Tenn. 2012).

*2. Application of Disqualification Law to the Facts of this Case*

As a preliminary matter, we note that the State argues before this Court that General Funk had no actual conflict of interest under the rules. Of course, as previously mentioned, the Court of Criminal Appeals observed that there was no "real dispute" that General Funk had an actual conflict of interest. Eady, 2022 WL 7835823, at *34. Indeed, from our review of the record, it appears that the parties assumed as much, given that it was not a topic of discussion below and the focus was on whether the District Attorney General's Office should be disqualified vicariously. Not surprisingly, the Defendant—although not expressly asserting waiver—points out that the State is advancing a new argument before this Court.[19] Of course, the issue presented—whether the trial court correctly denied the motion to disqualify—is not a new one, for it was raised properly below and in this Court. We acknowledge that the State's argument was not presented below. However, given our position as the final arbiter of the professional conduct of all lawyers practicing in Tennessee, see Bd. of Pro. Resp. v. Justice, 577 S.W.3d 908, 923 (Tenn. 2019), and our responsibility to apply the controlling law, see Nance v. Westside Hosp., 750 S.W.2d 740, 744 (Tenn. 1988) (opinion on petition for rehearing), we elect to exercise our discretion to consider the State's argument. See Tenn. R. App. P. 13(b).

RPC 1.11 addresses special conflicts of interest for former and current government officers and employees. Tenn. Sup. Ct. R. 8, RPC 1.11 (2019). It specifies, in part, that a lawyer serving as a public officer or employee is subject to RPC 1.9. Tenn. Sup. Ct. R. 8, RPC 1.11(d)(1). RPC 1.9, in turn, identifies duties to former clients. In pertinent part, it states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person *in the same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Tenn. Sup. Ct. R. 8, RPC 1.9(a) (2019) (emphasis added). Furthermore, the comments to RPC 9 provide:

> Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or other work the lawyer performed for the former client or if there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter, unless that information has become generally known.

---

[19] We note that because the Defendant was the appellant in this Court, he had an opportunity to and did, in fact, respond to the State's argument via his reply brief.

- 15 -

Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3 (2019).

The present Davidson County case clearly is not the "same" matter as the 1989 Cheatham County case. In other words, this is not an instance in which the prosecutor "switched sides" during the pendency of the present case. See State v. Phillips, 672 S.W.2d 427, 428–30 (Tenn. Crim. App. 1984).

Furthermore, we do not agree with the Defendant that the matters are "substantially related." In our view, they are at most tangentially related. The extent of the relationship between the 1989 case and the present case is that the simple fact of conviction in the 1989 case served as part of the qualification of the Defendant for an enhanced sentence in the present case. In this way, the present case is analogous to State v. Dixon, No. M2010-02382-CCA-R3-CD, 2012 WL 2356523 (Tenn. Crim. App. June 21, 2012), perm. app. denied, (Tenn. Nov. 26, 2012). In Dixon, a prosecutor previously represented the defendant on completely separate charges that later served as part of what qualified the defendant for enhanced sentencing. In rejecting a motion to disqualify the prosecutor, the Court of Criminal Appeals noted that there was no dispute about the fact of the prior convictions and there was no evidence that the prosecutor obtained information during the prior representation that had any bearing on the subsequent convictions. Id. at *14. In fact, there was no evidence that the prosecutor even remembered the prior representation, which had occurred eighteen years earlier. Id. at *13–14. We find this analysis instructive.

In this case, just as in Dixon, there was no dispute surrounding the Defendant's 1989 conviction, and it had no bearing on the Defendant's convictions in this case. In our view, the matters clearly do not involve the same legal dispute. Furthermore, we simply cannot conclude that there was a "substantial risk that confidential information that normally would have been obtained in the prior representation [other than information that] has become generally known" would materially advance the State's position in the present case. Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3 (2019). The only information of import for purposes of the present case was the simple fact of conviction in the 1989 case, which was public record and, therefore, not confidential. Under these circumstances, we conclude that the matters were not "substantially related" for purposes of RPC 1.9. Accordingly, under the Rules, General Funk did not have an actual conflict in this case on which to base any argument in favor of vicarious disqualification of the District Attorney General's Office.

Even absent an actual conflict on the part of General Funk under the Rules, however, the Defendant argues that the circumstances exhibited "a strong appearance of impropriety" that merited disqualification of the District Attorney General's Office. The Defendant draws from caselaw holding that even "[i]f there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety." Clinard v. Blackwood, 46 S.W.3d 177, 187 (Tenn. 2001) (quoting State v.

Culbreath, 30 S.W.3d 309, 312–13 (Tenn. 2000)). The Defendant insists that "[t]he 'appearance of impropriety' is therefore an independent ground upon which disqualification may be based." Id.

The Defendant relies heavily on concepts developed in Clinard v. Blackwood, a leading case exploring vicarious disqualification based on an appearance of impropriety. Clinard involved a lawyer with an actual conflict of interest, in that he previously represented parties adverse to parties represented by his current firm in the same legal dispute. The lawyer's firm implemented screening measures, which this Court found effective to defeat vicarious disqualification under the ethical rules then in effect. This Court nevertheless imputed disqualification to the firm. The basis for vicarious disqualification was "the serious appearance of impropriety." Id. at 181. Central to the Court's reasoning was the fact that the ethical rules in effect at the time, the Code of Professional Responsibility, specifically included a lawyer's duty to avoid the appearance of impropriety. Id. at 186. Thus, the Court concluded that an appearance of impropriety was an independent ground upon which the lawyer's firm could be disqualified vicariously.[20] Id. at 187.

Before this Court, the Defendant acknowledges that his argument stems from caselaw that relied on the Code of Professional Responsibility, a precursor to the Rules of Professional Conduct applicable in this case. See id. at 186. The Code of Professional Responsibility contained language specifically indicating that a lawyer should avoid even the appearance of professional impropriety. Id. Our current Rules of Professional Conduct did not retain that language. See Tenn. Sup. Ct. R. 8, RPC 1.10 cmt. 9 (2019). The Defendant urges us to reaffirm the viability of vicarious disqualification of government lawyers—even in the absence of an actual conflict—based on an appearance of impropriety, in spite of the omission of the pertinent language in the Rules of Professional Conduct.

Clearly, the Rules of Professional Conduct expressly declined to retain the appearance of impropriety standard from the Code of Professional Responsibility. See Tenn. Sup. Ct. R. 8, RPC 1.10 cmt. 9 (indicating that neither RPC 1.10 nor RPC 1.11 retains the appearance of impropriety standard that existed under the Code of Professional Responsibility). The Defendant points out—and the State concedes—that some panels of the Court of Criminal Appeals have held out the possibility that the appearance of impropriety standard still survives as a basis for imputed disqualification of a district attorney general's office. See, e.g., State v. Grooms, No. W2019-01324-CCA-R10-CD, 2020 WL 9171956, at *8 (Tenn. Crim. App. Nov. 15, 2020). However, we note that some of our sister states have abandoned the appearance of impropriety standard in light of the

---

[20] The Court held that an appearance of impropriety exists in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the representation poses substantial risk of disservice to either the public interest or the interest of one of the clients. Clinard, 46 S.W.3d at 187.

emergence of the Rules of Professional Conduct. <u>See, e.g.</u>, <u>People v. Solis</u>, 523 P.3d 427, 432 n.3 (Colo. 2022); <u>State v. Hudson</u>, 128 A.3d 739, 747 (N.J. Super. Ct. App. Div. 2015); <u>State v. Eighth Jud. Dist. Ct.</u>, 321 P.3d 882, 886 (Nev. 2014).

The matter before us is a criminal case involving no actual conflict of interest under the Rules, in which the Defendant nonetheless seeks to impute disqualification to the District Attorney General's Office. Simply put, we do not believe that the appearance of impropriety standard provides an independent basis for vicarious disqualification. Significantly, as previously mentioned, the Rules of Professional Conduct omitted any language referencing an appearance of impropriety standard. <u>See</u> Tenn. Sup. Ct. R. 8, RPC 1.10 cmt. 9.

In addition, the Rules contemplate that "where a lawyer represents the government after having served clients in private practice, nongovernmental employment, or in another agency," imputation is governed by RPC 1.11, which addresses conflicts of interest for government officers and employees. <u>See</u> Tenn. Sup. Ct. R. 8, RPC 1.10 cmt. 11 (2019). RPC 1.11(d) clearly provides that an individual lawyer serving as a public officer or employee is subject to both Rule 1.7 (pertaining to conflicts of interest) and Rule 1.9 (pertaining to the duties owed to former clients). However, the comments to RPC 1.11 make clear that "[b]ecause of the problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers." Tenn. Sup. Ct. R. 8, RPC 1.11 cmt. 2 (2019); <u>see also</u> Tenn. Sup. Ct. R. 8, RPC 1.11 cmt. 9 (2019) ("Paragraph (d) does not disqualify other lawyers in the agency with which the lawyer in question has become associated."). Instead, "[t]he individual lawyer involved is bound by the Rules generally." Tenn. Sup. Ct. R. 8, RPC 1.10 cmt. 11 (2019). Thus, declining to apply the appearance of impropriety standard is consistent with RPC 1.11, which specifically addresses conflicts of interest for current government lawyers.

Lastly, we note that even in <u>Clinard</u>, which held that the appearance of impropriety was then an independent ground for vicarious disqualification, this Court recognized that adherence to the appearance of impropriety standard might not be called for in the event of a change in the language of our rules governing attorney conduct. 46 S.W.3d at 186 n.7 (specifically referencing potential changes with regard to imputed disqualification cases). We reiterate that this case is not one in which a government lawyer "switched sides" in the same matter or otherwise had an actual conflict. We simply cannot conclude that the Rules, which by their own terms would not impute disqualification, somehow allow for vicarious disqualification based on an appearance of impropriety when the Rules did not retain that concept. To the extent any opinions of the Court of Criminal Appeals could be interpreted as maintaining the appearance of impropriety standard as an independent basis for imputed disqualification of government lawyers in criminal matters, <u>see, e.g.</u>, <u>Grooms</u>, 2020 WL 9171956, at *8, they are overruled.

Accordingly, although we reach the result for different reasons than the courts below, we conclude that there was no basis to disqualify the District Attorney General's Office from prosecuting this case.[21]  Thus, we affirm the judgment of the Court of Criminal Appeals in this regard.  See State v. Hester, 324 S.W.3d 1, 21 n.9 (Tenn. 2010) (holding that an appellate court may affirm on different grounds than those relied on by the lower court when the court has reached the correct result).

## B. The Severance Issue

Tennessee law provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count . . . if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character."  Tenn. R. Crim. P. 8(b).  This provision states the concept commonly referred to as permissive joinder of offenses.  With respect to permissive joinder of offenses, Tennessee law further provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."  Tenn. R. Crim. P. 14(b)(1).  Considered together, the two rules specify that, if offenses are permissibly joined in the same indictment simply because "they are of the same or similar character," then the defendant has the right to sever the offenses for trial.  Thus, this Court has recognized that if the defendant seeks to sever permissibly joined offenses, the offenses may be tried together only if (1) they are parts of a common scheme or plan, and (2) evidence of one would be admissible in the trial of the others.  See State v. Garrett, 331 S.W.3d 392, 402 (Tenn. 2011); Denton, 149 S.W.3d at 12–13.  Upon the defendant's motion to sever permissibly joined offenses, the State bears the burden of establishing both prongs.  Cf. State v. Toliver, 117 S.W.3d 216, 228 (Tenn. 2003) (citing Spicer v. State, 12 S.W.3d 438, 447 (Tenn. 2000)).

As the language of Rule 14(b)(1) makes clear, there are two prongs to the inquiry into whether the defendant may obtain a severance of permissibly joined offenses.  In this appeal, we focus on the first prong and examine the trial court's finding that the State produced evidence establishing that the various robbery offenses were parts of a common scheme or plan.[22]  This Court has recognized three categories of "common scheme or plan"

---

[21] Our decision on this issue in no way should be construed as countenancing the screening procedures employed by the District Attorney General's Office in this case.  Indeed, best practices likely should lead to a revision of the Office's screening policies.  See Tenn. Sup. Ct. R. 8, RPC 1.11 cmt. 2 (noting that "ordinarily it will be prudent" to implement screening procedures in the context of conflicts among government lawyers).

[22] Our approach is driven by the facts of this particular case.  The second prong certainly is equally significant in the analysis, for we have recognized that "a question of severance under Rule 14(b)(1) is

for purposes of Rule 14(b)(1). They are: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are parts of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Garrett, 331 S.W.3d at 404; Denton, 149 S.W.3d at 13; Moore, 6 S.W.3d at 240; see generally Cohen, supra, § 4.04[12][a], at 4-115. In this case, the State always has argued that the individual robberies reflected a "common scheme or plan" solely because the evidence showed they were parts of a larger, continuing plan. The trial court's decision on the motion to sever was in accord. As a result, we confine our analysis to that category of "common scheme or plan" as used in Rule 14(b)(1).

## 1. Standard of Review

Tennessee law is clear that an appellate court reviews a trial court's decision to deny severance of permissibly joined offenses under an abuse of discretion standard. Denton, 149 S.W.3d at 12; Spicer, 12 S.W.3d at 442; State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." Harmon, 594 S.W.3d at 305 (quoting Lee Med., Inc., 312 S.W.3d at 524); see also Garrett, 331 S.W.3d at 401. The decision to sever permissibly joined offenses pursuant to Rule 14(b)(1) requires a fact-intensive inquiry and "will necessarily turn on the facts of a particular case." Shirley, 6 S.W.3d at 247.

## 2. Application of Severance Law to the Facts of this Case

Before this Court, the State maintains that the trial court correctly denied the motion to sever. The State contends that the evidence, particularly the Defendant's statement to police, reflects that the various offenses were committed in furtherance of a readily distinguishable ultimate goal—to obtain money to satisfy a heroin addiction. Looking primarily to similarities in the offenses, the State further contends that the evidence supports the existence of a working plan on the part of the Defendant, operating toward the future so as to make probable each crime with which the Defendant was charged. In this vein, the State points to what it characterizes as: a common target ("convenience stores");

---

really a question of evidentiary relevance." State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999). Indeed, the presence of the second prong of the analysis demonstrates that the mere existence of a common scheme or plan among offenses does not render evidence of the offenses admissible. See Spicer, 12 S.W.3d at 443 ("Likewise, although Rule 8(b) permits consolidation when the offenses are parts of a common scheme or plan, Rule 14(b)(1) can be used to sever those offenses if evidence of each offense is not admissible in the trial of the others."); see also Moore, 6 S.W.3d at 239 n.6. As previously mentioned, the trial court in this case found that the evidence of the various charged offenses—reflecting a common scheme or plan—was relevant to the material issue of identity and that the danger of unfair prejudice to the Defendant did not outweigh the probative value of the evidence. Because we conclude that the trial court erred in finding a common scheme or plan under the first prong, we need not reach the trial court's findings as to the second prong.

the similar manner of the robberies (a perpetrator armed with a similar-looking handgun, holding the weapon primarily in his left hand, wearing similar clothing, concealing his identity in a similar way); the short time period covered by the offenses; and the confined geographic area covered by the offenses.

As a preliminary matter, we note that the Defendant complains in this Court about the consideration of certain evidence of his criminal history in the analysis of the severance issue. More specifically, in his statement to police, the Defendant made several references to his past criminal behavior. The intermediate appellate court referred to some of those statements in concluding that the Defendant formulated a plan, "based on his experience as a seasoned robber," to rob convenience stores when he needed money for heroin. Eady, 2022 WL 7835823, at *28 (referring to evidence that the Defendant and his brother had "always been robbers" and that he "resorted back to what [he] knew" when he needed money for heroin and did not have a job). The entirety of the Defendant's statement was available to the trial court for the hearing on the motion to sever, which was heard along with the Defendant's motion to suppress his statement. However, portions of the statement—including certain references to criminal history—were redacted at trial.

A motion to sever offenses ordinarily is a pre-trial motion. Consequently, evidence and arguments tending to establish or negate the propriety of severance should be presented to the trial court in a pre-trial hearing on the motion. Because a trial court's decision is determined from the evidence presented at the hearing, appellate courts typically should look only to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court erred in its decision. Spicer, 12 S.W.3d at 445; see also Denton, 149 S.W.3d at 13 n.3. It is a rare case that would call for a different procedure. See Toliver, 117 S.W.3d at 228 (electing to consider the evidence presented at trial to determine whether the State established that the offenses were part of a common scheme or plan, given that the matter was not raised until the first morning of trial and the proceedings on the severance issue were shortened). Thus, it was incumbent upon the Defendant to identify any concerns he had with the evidence presented to the trial court at the hearing on his motion to sever.[23] Nevertheless, we observe that references to criminal history in the Defendant's statement to police are not determinative of our resolution of the issue before us.

We begin our analysis of the severance issue by noting that, just as with the phrase "common scheme or plan," the language of Rule 14(b)(1) does not speak specifically to

---

[23] The trial court heard the motion to sever, took the matter under advisement, and later issued a written order denying the motion. We note that the Defendant filed a motion to reconsider the trial court's original decision to deny the motion to sever. At no time during the proceedings on the original motion or in the motion to reconsider did the Defendant identify any issue with respect to consideration of references to criminal history in his statement to police.

what constitutes a larger, continuing plan.  We do not believe the phrase is self-defining.[24] Instead, perhaps owing to the wide variety of facts that can constitute any number of criminal endeavors, the concept likely is better understood as "amorphous."  Walker v. Commonwealth, 770 S.E.2d 197, 200 (Va. 2015).  Of course, guiding principles have developed through caselaw over time.  Nevertheless, we acknowledge that the concept of a larger, continuing plan is not always straightforward.  See David P. Leonard, The New Wigmore: Evidence of Other Misconduct and Similar Events § 9.2.2, at 574 (2009) (stating that "what constitutes a 'plan' is subject to interpretation").  Indeed, commentators have delved deeply into the subject, and not surprisingly, there has been much room for debate. See, e.g., Edward J. Imwinkelried, Using a Contextual Construction to Resolve the Dispute over the Meaning of the Term "Plan" in Federal Rule of Evidence 404(b), 43 U. Kan. Law Rev. 1005, 1011–16 (1995) (discussing contrasting conceptions of the doctrine, including the "unlinked plan theory," the "linked methodology theory," the "linked act theory," and variations within them).

However, universal in the commentary and caselaw on the concept of a "common plan" is an evidentiary concern.  The appeal of evidence that separate crimes were parts of a common plan lies in how it can establish a logical connection between instances of criminal conduct so as to support an inference that because a defendant engaged in certain conduct, he likely engaged in other conduct.  See Leonard, supra, § 9.1, at 555 ("A person who has devised a plan is more likely to act consistently with that plan than is a person who does not have such a plan.").  The challenge is that using evidence in this way implicates the evil that Tennessee Rule of Evidence 404(b) seeks to prevent.[25]  The justification for trying offenses that constitute parts of a larger, continuing plan together— much like that for legitimately admitting evidence of other crimes in the trial of a different offense under Rule 404(b)—is that it theoretically requires no inference as to the defendant's character.  Instead, the defendant's behavior is the product of a commitment to a course of conduct of which each offense is only a part.  The evidence of multiple offenses is permissible when it shows the larger goal rather than merely the defendant's

---

[24] We note that at one time, Black's Law Dictionary included a general definition of "plan" as "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object" as well as a "method of putting into effect an intention or proposal."  Plan, Black's Law Dictionary (6th ed. 1990).  More recently, however, the general definition has been omitted, leaving only more specific contexts (e.g., bankruptcy plan, employee benefit plan).  Plan, Black's Law Dictionary (9th ed. 2009).

[25] Rule 404(b) prohibits evidence of other crimes "to prove the character of a person in order to show action in conformity with the character trait."  Tenn. R. Evid. 404(b).  Generally speaking, then, Rule 404(b) prohibits the admission of evidence of the character of the defendant when offered to show that the defendant acted in a certain way on a particular occasion because the defendant had a propensity or inclination to act that way.  The limitations associated with the rule ultimately flow from the recognized legal principle that "the doing of one act is in itself no evidence that the same or a like act was again done by the same person."  1A Wigmore, Evidence § 55.1, at 1161 (Tillers rev. ed. 1983).  Trying multiple offenses in the same trial obviously presents evidentiary concerns that parallel those behind Rule 404(b) regarding admission of evidence of "other crimes" in the trial of a single offense.

propensity to commit crimes. See 22B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5244, at 139–40 (2d ed. 2017).

Nevertheless, we have recognized that the admission of evidence of multiple crimes "carries with it the inherent risk of the jury convicting a defendant of a crime based on his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge." Garrett, 331 S.W.3d at 402 (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)). Thus, trying offenses together risks inviting the jury to infer improperly that the defendant has a propensity to commit crimes, exploiting the very propensity inference that Rule 404(b) is designed to prohibit. See Moore, 6 S.W.3d at 239. The evidentiary concern underscores the importance of ensuring that courts correctly evaluate whether evidence of multiple offenses reflects a larger, continuing plan. See Imwinkelried, supra, 43 U. Kan. Law Rev. at 1008 (noting condemnation of the "invocation of the plan theory when the prosecutor can show only that the accused has recently committed parallel offenses" because it "undercut[s] the character prohibition by converting the plan doctrine into a plan-to-commit-a-series-of-similar-crimes theory").

There is no doubt that determining whether multiple offenses reflect a larger, continuing plan sometimes can prove challenging.[26] Experience teaches that direct evidence of a plan is the exception rather than the rule. Instead, courts more typically must infer the existence of a plan from the evidence as a whole. Our courts have crafted several guiding principles. For instance, we have observed that, fundamentally, the "larger, continuing plan" category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose. See, e.g., Denton, 149 S.W.3d at 15; see also State v. Osborne, 251 S.W.3d 1, 11 (Tenn. Crim. App. 2007); State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Thus, it is not necessarily the similarity between offenses that establishes a larger, continuing plan, "but [rather] the common goal or purpose at which they are directed." Denton, 149 S.W.3d at 15 (quoting State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447). Indeed, there is no requirement that the offenses constituting a larger, continuing plan be similar at all. See Cohen, supra, § 4.04[12][c], at 4-119 to 4-120. Accordingly, the fact that a defendant has committed a series of crimes rightfully viewed as being of the "same or similar character" does not necessarily reflect a larger, continuing plan. See Moore, 6 S.W.3d at 241. Instead, courts should look to whether there is "evidence that the defendant had a working plan operating towards the future such as to make probable the crime with which the defendant is charged." Denton, 149 S.W.3d at 15; see also Cohen, supra, § 4.04[12][c], at 4-120.

---

[26] Of course, although the concept of plan stretches as far as the imagination, there are archetypal examples. For instance, a larger, continuing plan could include a "sequential" plan in which a defendant commits one offense in preparation for another (e.g., stealing a key to break into a bank), or a "chain" plan in which a defendant murders various individuals, without regard to sequence, to achieve an overarching goal to eliminate all those who would take title to land before him. See Leonard, supra, §§ 9.2.1.a., at 562; 9.2.1.b., at 567. We do not believe the record in this case is as clear as those examples.

As for the concept of a common ultimate goal or purpose, we have emphasized that the larger, continuing plan category contemplates offenses committed in furtherance of a plan that has a readily distinguishable ultimate goal or purpose, not simply a string of similar offenses. Denton, 149 S.W.3d at 15. A larger, continuing plan typically "connotes a series of acts done with a relatively specific goal or outcome in mind." Leonard, supra, § 9.2.2, at 572. The less specific the goal, the greater the chance the plan "in actuality amounts to no more than a general desire to engage in criminal behavior for personal gain or satisfaction." Id. § 9.2.2, at 576. And "the more generalized the plan inference, the more like character it becomes, and the greater the danger of unfair prejudice from its use at trial." Id. § 9.2.1, at 565.

In denying the Defendant's motion to sever in this case, the trial court took note of the State's position that the offenses shared a "common goal, or purpose, to fuel [the Defendant's] drug addiction and purchase heroin." The trial court—noting the State's position emphasizing the similarities in methodology of the offenses, the one-month time frame during which all offenses were committed, and the relatively limited geographic region where the offenses occurred—stated that the offenses were "so related to each other that proof of one tends to establish the others." Ultimately, the trial court concluded that this "proof shows a 'working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" See Cohen, supra, § 4.04[12][c], at 4-120. Similarly, in affirming the trial court's decision, the majority of the Court of Criminal Appeals concluded that the proof evidenced a common ultimate goal among the various robberies, namely to provide "money to finance [the Defendant's] heroin addiction." Eady, 2022 WL 7835823, at *28. Like the trial court, the Court of Criminal Appeals also emphasized the similar methodologies employed in the various robberies, the time frame, and the geographic reach. Id. at *29.

In our view, the generic shared motivation among the Defendant's offenses—needing money to satisfy his heroin addiction—does not go very far in establishing that the various offenses—robberies in this case—were parts of a *larger*, continuing plan. See Prentice, 113 S.W.3d at 332 (stating that "shared motivation for two otherwise unrelated crimes is not sufficient to establish a 'common scheme or plan'"). Although a shared motivation can factor into the determination, if offenses could be joined "simply because the defendant was inspired by the desire for money, the duty of courts to inquire whether the offense conduct constituted a 'common scheme or plan' would, in most cases, be rendered meaningless." United States v. Dileo, 859 F. Supp. 940, 942–43 (W.D. Pa. 1994); see also Brooks v. Commonwealth, 856 S.E.2d 599, 605 (Va. Ct. App. 2021) ("[T]o find a 'common plan,' the goal must be more than mere profit, as profit is often intrinsic to crime.").

Similarly, it certainly can be relevant to the existence of a larger, continuing plan that various offenses are closely connected in time, place, and means of commission. In

- 24 -

this case, however, the similarities in methodology are relatively generic.[27]  A perpetrator, who took relatively similar measures to conceal his identity and was armed with a similar-looking handgun, entered various types of retail businesses that would be expected to have a cash register and demanded money.[28]  We acknowledge that the total time frame entailed eleven offenses spread out over a single month.  However, as to the geographic reach, the record indicates that although the offenses all occurred in Nashville, they occurred in more than one neighborhood covered by more than one police precinct.  In our view, these characteristics do not reveal a readily distinguishable, relatively specific ultimate goal or purpose.  We do not believe it is enough to show that each offense was "planned" in the same way.  There must be evidence from which to infer an overall plan of which each robbery is a part.  We reiterate that just because a defendant has committed a series of crimes of the same or similar character does not necessarily reflect a larger, continuing plan.  See Moore, 6 S.W.3d at 241.

We believe the trial court's severance decision failed to recognize that the appropriate standard calls for evidence from which it can infer a *larger*, continuing plan among the offenses.  The offenses in this case were robberies.  In this context, we find instructive the guidance from the Virginia Supreme Court that a common plan entails offenses "related to one another for the purpose of accomplishing a particular goal," and "[t]he key factor . . . is that the goal furthered by the offenses must be *extrinsic* to at least one of them."  Walker, 770 S.E.2d at 201; see also Brooks, 856 S.E.2d at 605 ("A common plan is established 'when the constituent offenses occur sequentially or interdependently to advance some common, extrinsic objective.'"); Imwinkelried, supra, 43 U. Kan. Law Rev. at 1019 (stating that a common plan "ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not attainable by the commission of any of the individual offenses"); 1 Kenneth S. Brown, McCormick on Evidence § 190, at 1034 (7th ed. 2013) (stating that to constitute a common plan, "each crime should be an integral part of an over-arching plan").

Because the offenses in this case were robberies, a shared motivation to obtain money was to be expected.  We do not doubt—as the trial court observed—that the goal of each robbery was to obtain money to satisfy the Defendant's heroin addiction.  That goal,

---

[27] As previously mentioned, the State does not contend that the methodologies of the offenses were similar enough to reflect a distinctive design or signature crime.  Indeed, even considering the left-handed perpetrator, there was nothing so unique about the methodology of the offenses that would demonstrate a distinctive design.  See Shirley, 6 S.W.3d at 249 (noting that the use of a mask, gloves, and gun to commit a robbery is not so unusual that reasonable people would conclude that the same person committed all of the offenses).

[28] We note that the victims' descriptions of the perpetrator varied.  Furthermore, although the State characterizes all of the businesses simply as "convenience stores," the record shows variations among them, from a Dollar General to a Walgreens to a CVS to gas stations.  Likewise, the record does not reveal any kind of unifying principle about the timing of the robberies—which varied from mid-afternoon to shortly after midnight—that would suggest a larger, continuing plan.

however, was completed with each offense. The Defendant's statement to police indicated that he was not trying to make a living through robbery. In our view, then, the record does not establish that the eleven incidents were tied together through an objective "not obtainable by the commission of any of the individual offenses." Walker, 770 S.E.2d at 199; see also Imwinkelried, supra, 43 U. Kan. Law Rev. at 1019.

We have recognized that any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant. Garrett, 331 S.W.3d at 403. Based on our review of the record, we do not believe that the existence of a larger, continuing plan among the various offenses with a readily distinguishable ultimate goal or purpose reasonably could be inferred from the evidence. Instead, we believe the evidence in this case reflects simply a string of similar offenses.[29] As such, we agree with Judge McMullen that the State did not bear its burden of establishing the "common scheme or plan" necessary to preclude the Defendant from severing the offenses. See Denton, 149 S.W.3d at 15; Tenn. R. Crim. P. 14(b)(1). The offenses certainly were of the "same or similar character," Tenn. R. Crim. P. 8(b)(2), but a defendant has an absolute right to sever offenses that are merely of the same or similar character, Spicer, 12 S.W.3d at 446. Thus, we conclude that the trial court erred in denying the motion to sever.

Having concluded that the trial court erred in denying the motion to sever, we must consider the effect of the error. Because the question of whether to grant a severance under Rule 14(b)(1) is primarily an evidentiary question, the effect of a denial of that right is evaluated under the same standard as other non-constitutional evidentiary errors. Garrett, 331 S.W.3d at 405; Denton, 149 S.W.3d at 15 (citing Moore, 6 S.W.3d at 242). Thus, a defendant must show that the error more probably than not affected the judgment or would result in prejudice to the judicial process before reversal is appropriate. Garrett, 331 S.W.3d at 405; Denton, 149 S.W.3d at 15; see also Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 371–72 (Tenn. 2008).

It is axiomatic that evidence of multiple crimes can have a significant impact on the jury. Having heard about one crime, a jury may be more inclined to find the defendant

_____

[29] Contrast this case with State v. Edwards, in which the defendant was convicted of multiple burglary and theft offenses after his motion to sever was denied. State v. Edwards, No. W2014-00987-CCA-R3-CD, 2015 WL 5169110 (Tenn. Crim. App. Aug. 27, 2015), perm. app. denied, (Tenn. Dec. 11, 2015). The offenses stemmed from break-ins at multiple homes in the same neighborhood during which various electronics and pieces of jewelry were stolen. The proof included evidence of a generally similar methodology and a confined geographic reach. Id. at *1–2. However, the proof also included evidence of notebook pages, seized from the defendant, containing a list of addresses in the relevant neighborhood—with notes indicating whether those occupants appeared to be out of town—and pawn shop business cards. Id. at *1. The Court of Criminal Appeals affirmed the denial of a severance, noting that "[t]he list tends to show that the [d]efendant was casing this Germantown neighborhood to determine when the homes' occupants were out of town in order to break into the houses and steal property." Id. at *15. Considering the evidence as a whole, the court inferred a larger working plan, not simply a string of burglaries. Id.

guilty of another. See Cohen, supra, § 4.04[8][a], at 4-101 (noting the same with respect to "other crimes" evidence permitted by Rule 404(b)). Nevertheless, we often have observed that the line between harmless and prejudicial error is in direct proportion to the degree by which proof exceeds the standard required to convict. Denton, 149 S.W.3d at 15 (citing Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)); Spicer, 12 S.W.3d at 447–48. In other words, "[t]he more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits." Toliver, 117 S.W.3d at 231 (quoting State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000)). Even so, appellate courts must remain focused not simply on the weight of the evidence, but on "the actual basis for the jury's verdict." Garrett, 331 S.W.3d at 405 (quoting Rodriguez, 254 S.W.3d at 372). "In making this determination, we consider the whole record and focus on the 'impact the error may reasonably be taken to have had on the jury's decision-making.'" Id. (quoting Rodriguez, 254 S.W.3d at 372).

We can dispense with counts one through seven and nine through twelve with relative ease. In his statement to police, the Defendant admitted responsibility for each incident covered by these counts. The Defendant's statement was admitted at trial, and the Defendant does not challenge that ruling here. As a result, we have no hesitation in concluding that the erroneous denial of the motion to sever did not affect the judgment as to those counts, and we do not believe the Defendant has carried his burden to show prejudice to the judicial process based on this record.

Count eight, however, is a different matter. Count eight corresponded to the November 26 incident at the Delta Express on Thompson Lane. The victim, Stella Rice, was unable to identify the perpetrator. She described him as taller than her (5'7") and "probably" about 5'8", thirty-five to forty years old, weighing 180 pounds. The Defendant was fifty-four years old, 5'11" tall, and weighed 200 pounds. Although the video surveillance footage appeared to show the perpetrator holding a gun in his left hand, Ms. Rice testified that "[i]t was confusing." Police investigation revealed that the Defendant's cell phone communicated with a cell tower in the general area of the store a little over fifteen minutes after the robbery. Significantly, in contrast to all other counts, the Defendant did not admit responsibility for count eight, telling police, "I don't remember doing one on Thompson Lane."

"[T]he danger of a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial is particularly strong when the conduct or acts are similar to the crimes on trial." Rodriguez, 254 S.W.3d at 376 (internal quotation marks omitted); see also State v. Jones, 450 S.W.3d 866, 894 (Tenn. 2014) (noting that the danger of unfair prejudice is especially prevalent with similar crimes, "increasing the likelihood that '[the] jury would convict on the perception of a past pattern of conduct, instead of on the facts of the charged offense'" (quoting State v. Mallard, 40 S.W.3d 473,

488 (Tenn. 2001)). A heightened risk also may arise where the State's case is much stronger against the defendant as to charges arising out of some criminal offenses than as to another offense. See Dotson, 254 S.W.3d at 389–90 (expressing concern that stronger evidence as to some incidents could spill over and influence the jury's willingness to convict on the charges where the evidence is weaker). Factors weighing against a finding of harmless error include: (1) conviction on a charge where the evidence is not strong; (2) factual similarities between the offenses; (3) the State's intertwining the offenses in opening statement, during its case-in-chief, or in closing argument; (4) a guilty verdict on all counts; (5) offenses that are inflammatory in nature; and (6) unusually large and complex trials. State v. Gallegos, 152 P.3d 828, 840 (N.M. 2007).

With these factors in mind, we turn to examine the Defendant's conviction on count eight. First and foremost, we do not believe the evidence supporting the conviction was strong. The victim could not identify the perpetrator, and the victim's physical description of the perpetrator varied somewhat from the Defendant's actual appearance. It is true that the Defendant's cell phone communicated with a cell tower in the general area of the store a little over fifteen minutes after the robbery, but in light of the paucity of other incriminating circumstances associated with this particular incident, that evidence hardly makes the proof of guilt strong. Similarly, the Defendant admitted being left-handed, and video surveillance footage appeared to show the perpetrator holding a gun in his left hand. But these circumstances, considered in the isolation of this one incident, likewise hardly render the proof of guilt strong. Additionally, we note that the charged offenses were the same, and the methodology of the various offenses shared general similarities. Moreover, the State stressed these similarities during closing argument to the jury. In particular, after describing the facts of count eight during closing argument—including the fact that the Defendant told police he did not remember committing an offense on Thompson Lane— the State bolstered the proof of this incident by grouping it with the other incidents (for which there was stronger proof of guilt, given the Defendant's confessions): "But you guys saw the video of how this [the November 26 robbery] went down. There can be no doubt that the same individual committed this robbery that committed the other ones."[30] As previously mentioned, the Defendant was convicted as charged on all counts. Lastly, we acknowledge that the offenses were not inflammatory in nature and the trial was not unusually large and complex.

Under these circumstances, common sense tells us that the jury believed the Defendant committed the robberies he had confessed to, and that the evidence pertaining to count eight was made far more credible by the evidence pertaining to the other counts. Cf. Denton, 149 S.W.3d at 16–17. Thus, consolidation of the offenses into a single trial "invited the jury to infer the [defendant's] guilt from a perceived propensity to commit armed robbery." Garrett, 331 S.W.3d at 407 (quoting Shirley, 6 S.W.3d at 251) (alteration

---

[30] We do not suggest that the State's closing argument was improper. After all, the trial court allowed the offenses to be tried together.

in original).  Based on all of the above circumstances, we conclude that the Defendant has carried his burden of demonstrating that the erroneous failure to sever the offenses more probably than not affected the judgment on count eight.  Accordingly, we reverse the Defendant's conviction on count eight and remand to the trial court for a new trial.

### III. CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in denying the Defendant's motion to disqualify the District Attorney General's Office from prosecuting this case.  We further hold that the trial court did err in denying the Defendant's motion to sever all counts—with the exception of counts one and two as to each other—for trial.  However, we have determined that the error was harmless with respect to all convictions except the one based on count eight.  Accordingly, we affirm the judgment of the Court of Criminal Appeals with respect to counts one through seven and nine through twelve, reverse it with respect to count eight, and remand this case to the trial court for a new trial as to count eight.

Because the Defendant appears to be indigent, the costs of this appeal are taxed to the State.

_____
JEFFREY S. BIVINS, JUSTICE